**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

NEWLEAF DESIGNS, LLC,

Plaintiff,

v.

BESTBINS CORPORATION,

Defendant.

Civil No. 01-396 (JRT/SRN)

**MEMORANDUM OPINION AND ORDER**

---

Michael S. Ryan, MURNANE, CONLIN, WHITE AND BRANDT, P.A., 1800 U.S. Bancorp Piper Jaffray Plaza, 444 Cedar Street, St. Paul, MN 55101 and Mark A. Losey, ARTER & HADDEN, LLP, 10 West Broad Street, Suite 2100, Columbus, OH 43215, for plaintiff.

Eric Braaten and Charles Hollenhorst, NICKLAUS BRAATEN & HOLLENHORST, 500 Pine Street North, Suite 200, Chaska, MN, 55318, for defendant.

NewLeaf brings this lawsuit against BestBins asserting federal trademark claims pursuant to 15 U.S.C. § 1125, a state theft of trade secret claim pursuant to Minn. Stat. § 325C.01, and a common law claim for conversion of corporate opportunities. The matter is now before the Court on NewLeaf's motion for a preliminary injunction, seeking to enjoin BestBins from using in any manner all of NewLeaf's trade secrets, business plans, customer lists, product improvement designs, marketing intelligence and

FILED APR 1 0 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

other properties or assets of NewLeaf. For the reasons set forth below, the Court denies NewLeaf's motion for preliminary injunctive relief.

**BACKGROUND**

This lawsuit involves a dispute between competing manufactures of plastic storage bins that are used to hold and dispense bulk food items. NewLeaf began to sell its version of storage bins in 1997. BestBins was formed in 2000 by a group of employees who were formerly employed by NewLeaf. BestBins is now prepared to introduce a competing storage bin into the marketplace. NewLeaf alleges that BestBins has misappropriated its trade secrets to develop, market and sell a competing storage bin.

Eric Rivkin ("Rivkin") was the founder and sole owner of NewLeaf Designs, Inc.[1] Rivkin was responsible for all of NewLeaf's research and development efforts. In 1997, Rivkin designed a molded gravity feed bin, called the Vita-Bin, which was introduced in the marketplace around mid-1997. The Vita-Bin is a plastic storage bin that is used to hold and dispense bulk food items. The Vita-Bin is currently the only gravity bin sold by NewLeaf.

Shortly after the Vita-Bin was introduced into the marketplace, NewLeaf contends that Rivkin began working to identify its design deficiencies and to develop a new and improved line of contamination-resistant bins that he intended to call the "Bio-Secure" line of products. NewLeaf submits that Rivkin was engaged in this effort from sometime in 1997 through 1999. In September 1997, NewLeaf filed extensive documents with the

---

[1] Effective January 1, 2001, NewLeaf Designs, Inc. ceased to exist and NewLeaf Designs, LLC purchased all of the trade secrets of the predecessor corporation. For purposes of this opinion, the Court will simply refer to the plaintiff as "NewLeaf," rather than make a distinction between the two entities.

U.S. Patent and Trademark Office relating to various design improvements on the Vita-Bin as evidence of the dates of conception of invention under the Disclosure Document Program. NewLeaf claims that the improvements Rivkin identified for the Vita-Bin included: (1) a round spout with a twist and lock mechanism; (2) a bayonet-type mounting arrangement; (3) an externally mounted handle return spring; (4) an elastometric bag gripper nozzle; and (5) a coated one piece handle. Rivkin claims those design features are confidential and were released only to authorized NewLeaf personnel, including Robert Groenevelt.

In January 1999, Rivkin hired Robert Groenevelt as president and CEO of NewLeaf. Groenevelt was brought on to oversee the managerial and operational duties of all company functions, except for research and development, which was left solely to Rivkin. As CEO and president, Groenevelt had full responsibility for NewLeaf's finances, intellectual property protection, hiring, and sales and marketing efforts. To assist him, Groenevelt hired John Williams as Executive of Sales and Marketing, Jill Campbell as an executive assistant, Patrick Reynolds as National Sales Manager, and Kyle McDonough as National Sales Manager of Pet Foods.[2] The senior management team that discussed and controlled the day-to-day management and operations of NewLeaf consisted of Groenevelt, Williams and Curt Reynerds, the former Director of Finance and Controller.

By the summer of 2000, NewLeaf was experiencing serious financial problems. In late May or early June of 2000, Rivkin hired a "turn-around" consultant to address

[2] Groenevelt, Williams, Campbell, Reynolds and McDonough eventually formed BestBins Corporation.

NewLeaf's financial difficulties. After hiring the consultant, Groenevelt was terminated. After being terminated, Groenevelt demanded payment of severance pursuant to his employment agreement with NewLeaf. NewLeaf refused to pay Groenevelt severance claiming that he was terminated for cause. Groenevelt eventually sued NewLeaf for breach of the employment agreement and the parties later reached a settlement. In July 2000, Campbell, Reynolds, and McDonough terminated their employment with NewLeaf. Williams remained at NewLeaf until November 2000 when he too terminated his employment with NewLeaf.

Several weeks after leaving NewLeaf, McDonough, Campbell and Reynolds gathered at McDonough's home for cocktails. The three claim that they got together to discuss current job market conditions and employment prospects. The former NewLeaf employees also claim that they discussed the possibility of developing better storage bins than those produced by NewLeaf. This discussion led to the creation of a 16-point talking list entitled "Gravity Bin Design Ideas," which included their thoughts on how to develop a superior storage bin.

In August 2000, the three contacted Groenevelt to inquire about his interest in joining their potential endeavor. Groenevelt indicated his interest and was able to set up a meeting with the president and a project manager of Molded Rubber and Plastic Corp. ("Molded Rubber")[3] in Butler, WI. The group brainstormed about ways to create a better gravity bin. Those attending the meeting contend that only the 16-point list and an existing NewLeaf Vita-Bin were brought to the meeting. After this initial meeting, the

[3] The president of the company was a long-time business acquaintance of Groenevelt.

president of Molded Rubber then set up a meeting with a local engineering design company to discuss the possibility of producing a prototype storage bin based on the group's discussion.

The group then met with KALD Tool & Die Corp. ("KALD"), the engineering firm suggested by Molded Rubber. Again, BestBins alleges that the only items brought to this meeting were the 16-point talking list and an existing Vita-Bin. KALD maintains that it was never shown NewLeaf's design drawings or sketches. After securing a fee for the conceptual design work, the engineers at KALD visited stores that used gravity storage bins. The trips were made to observe the way that shoppers used the NewLeaf Vita-Bin as well as other storage bins. Based on these observations and the brainstorming sessions, BestBins and KALD allege that they completed the design and actual molds for the "Next Generation" bin at a cost of $275,000.

NewLeaf claims that during the time Groenevelt served as NewLeaf's president and CEO, he had access to all of NewLeaf's trade secrets, including its customer lists, vendors, costs, market intelligence, business plans and design sketches through the company's computer system.[4] NewLeaf also claims that Rivkin discussed his design innovations and strategies with both Groenevelt and Williams. BestBins, however, claims that Groenevelt did not have access to Rivkin's personal files. BestBins also argues that Rivkin infrequently attended meetings of the senior management team and did not share design sketches or confidential research and development information with that group.

---

[4] NewLeaf also alleges that Williams had access to all of the confidential information to which Groenevelt had access.

Rivkin also claims that NewLeaf personnel discussed incorporating his improved design features into a new line of products called the "Next Generation" bin. Based on Rivkin's review of BestBins' new sales materials, NewLeaf alleges that BestBins misappropriated Rivkin's design concepts. NewLeaf argues that many, if not all of his design innovations, developed between 1997 and 1999 are incorporated into BestBins' "Next Generation" bin. NewLeaf also alleges that BestBins has misappropriated its trademarks, "Next Generation," "Bio-Secure," and "Bio-Safe." BestBins denies these allegations.

In response to NewLeaf's allegations, BestBins flatly denies that it misappropriated any of NewLeaf's trade secrets. BestBins claims it simply used common and universal design features to create its product. It also claims that NewLeaf used commonly known marketing and operational strategies to begin its business and target potential customers. BestBins argues that NewLeaf's customer lists simply comprised the names of businesses that are high volume bin users in various industries, names that are available from trade publications and trade shows. BestBins also argues that NewLeaf's customer list was not adequately protected as a trade secret because it was regularly sent out to potential customers. In essence, BestBins argues that NewLeaf did not have any unique trade secrets for it to misappropriate.

## ANALYSIS

### I. Standard for Awarding Preliminary Relief

In evaluating a motion for a preliminary injunction, the Court considers the four factors set forth by the Eighth Circuit in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d

109, 112-14 (8th Cir. 1981): (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in absence of relief; (3) the balance between the harm and the harm that the relief would cause to the other litigants; and (4) the public interest. The Court balances the four factors to determine whether injunctive relief is warranted. *Id.* at 113; *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999). The NewLeaf bears the burden of proof on all four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

## II. Analysis of *Dataphase* Factors

### A. Likelihood of Success on the Merits

NewLeaf moves for a preliminary injunction based on its claim for misappropriation of trade secrets.[5] Because the parties focus only on the trade secret claim, the Court too will only analyze the likelihood of success on the merits for that particular claim.

#### 1. Misappropriation of Trade Secrets

NewLeaf seeks to enjoin BestBins from acquiring, using or disclosing the design ideas, customer lists, marketing intelligence, business plans, supplier information, and operating information that belong to NewLeaf. NewLeaf asserts that it will likely succeed on this claim at trial. The Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.01-08, protects certain information through an action for misappropriation. Misappropriation is defined as the improper acquisition, disclosure, or

[5] As noted above, NewLeaf has also asserted claims of false designation of origin pursuant to 15 U.S.C. § 1125, false advertising pursuant to 15 U.S.C. § 1125, and conversion of corporate opportunities.

use of a "trade secret." Minn. Stat. § 325C.01, subd. 3. In order for information to be considered a "trade secret" for purposes of the statute, the Minnesota Supreme Court has required that: (1) the information not be generally known or readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) plaintiff must make reasonable efforts to maintain secrecy. *Lexis-Nexis*, 41 F. Supp. 2d at 958; *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899-901 (Minn. 1983). The burden is on the party asserting misappropriation to establish each factor. *Lexis-Nexis*, 41 F. Supp. 2d at 958. In addition, to obtaining injunctive relief under MUSTA, the movant must show there is a high degree of probability of inevitable disclosure. *Id.* (internal quotations omitted).

The Court is unable to conclude that NewLeaf's customer lists, market intelligence, business plans, supplier information and operating information constitute trade secrets as defined by Minnesota law. NewLeaf provides little detail as to the specific information in each of these categories that it alleges constitute trade secrets. With respect to its customer lists, NewLeaf alleges that the lists are centrally stored on its password-protected computer system. During the hearing on this matter, NewLeaf argued that the customer lists were more than simply lists, but included detailed information about each particular customer. NewLeaf, however, has failed to produce any such list or even a portion of the list to the Court. NewLeaf has also failed to point to any authority to support its position that the lists are trade secrets. Another court in this district has held that a customer list, which included key contact information for each customer, did not constitute a protectable trade secret under MUSTA. *Lasermaster Corp.*

*v. Sentinel Imaging*, 931 F. Supp. 628, 637-38 (D. Minn. 1996). Further, BestBins has provided evidence that calls into question whether NewLeaf made reasonable efforts to protect the secrecy of its customer lists[6] and has raised significant doubt as to whether the information contained in NewLeaf's customer lists is generally known or readily ascertainable in the industry.[7] Without anything more than NewLeaf's assertion that its customer lists should enjoy trade secret protection, the Court cannot find that NewLeaf has met its burden with respect to this information.[8]

NewLeaf has been similarly non-descriptive about the specific marketing intelligence, business plans, supplier information and operating information it seeks to protect. NewLeaf alleges that it "acquired market intelligence to identify customer needs and deficiencies in products" and then "developed strategies to address market needs, including business plans and strategies for launching its containment-resistant 'Bio Secure Scoop Bin and Improved Gravity Bin' within the next 3 years.'" During the hearing on this matter, NewLeaf directed the Court to exhibits E and G attached to Rivkin's second affidavit as examples of NewLeaf's business plans and marketing information. However, upon review of those documents and the other exhibits submitted by NewLeaf, the Court finds only general information and specifications about

---

[6] BestBins asserts that NewLeaf regularly mails out a list of its customers with its sales and promotional literature.

[7] BestBins argues that it has identified customers simply through identifying stores and businesses that sell bulk items and may therefore need bins in which to store those items. BestBins also argues that any names contained on NewLeaf's customer lists are readily ascertainable from trade journals and lists of attendees at trade shows.

[8] The Court notes that thus far NewLeaf has also failed to provide any evidence whatsoever that BestBins has misappropriated its customer list.

NewLeaf's storage bins. They are in no way detailed and specific. Without further specificity the Court again cannot find that this information constitutes protectable trade secrets.

The remaining trade secret for which NewLeaf requests protection are the design sketches and design innovations made by Rivkin from 1997 through 1999. The design sketches certainly qualify as trade secrets within the meaning of MUSTA. Because NewLeaf has indicated that it kept the sketches secret and there is arguable independent economic value derived from the secrecy, the Court will assume that the sketches and design innovations constitute trade secrets. NewLeaf, however, has proffered no evidence to indicate that BestBins has misappropriated these trade secrets in any way. There is no proof in the record at this time that any employees of BestBins viewed or are in possession of NewLeaf's design sketches. NewLeaf has not sustained its burden of showing improper acquisition, disclosure or use of these trade secrets.[9] In contrast, BestBins has offered significant affidavit testimony explaining the design process that it undertook to develop its own storage bin.[10]

---

[9] NewLeaf relies only on conclusory allegations by Rivkin that employees of BestBins had access to NewLeaf's design sketches and must have misappropriated his design innovations.

[10] In addition to the affidavits of BestBins employees Groenevelt, Campbell, McDonough, Williams and Reynolds, BestBins offered the affidavit testimony of Curt Reynerds, former Director of Finance and Controller at NewLeaf, who is not associated with either NewLeaf or BestBins. His affidavit stated that in his capacity as a senior manager he never saw the design sketches of Rivkin. Paul Siodlarz, Chief Executive Office of KALD, also submitted affidavit testimony which stated that in working with BestBins to design and develop its storage bin, he was never shown NewLeaf documents or sketches. Finally, BestBins offered the affidavit of Thomas Brunner, president and CEO of Molded Rubber, stating that he was never shown NewLeaf's design sketches, business plans, marketing information or customer lists.

NewLeaf has not sustained its burden of showing a likelihood of success on the merits. The first *Dataphase* factor therefore weighs against issuing a preliminary injunction. The Court notes, however, that this conclusion is not intended to provide any opinion as to the ultimate merit of NewLeaf's claims. At this early stage of the proceedings, the parties have not yet conducted discovery nor completed investigation of the all facts. New or additional facts may very well arise during discovery that could change NewLeaf's likelihood of success on the merits.

**B. Threat of Irreparable Harm**

NewLeaf alleges that BestBins' misappropriation of its trade secrets will deprive it of the benefits of its customer lists, market intelligence, business plans, and product improvements. These injuries, it argues, are prospective and the damages flowing from them inestimable. NewLeaf has not, in the Court's opinion, demonstrated why monetary damages would fail to compensate it for any wrongful use of its trade secrets in this particular case. *Bloom v. O'Brien*, 841 F. Supp. 277, 279 (D. Minn. 1993) (explaining that to show irreparable harm plaintiff must show that harm is not compensable by money damages). Here, BestBins is attempting to market and sell only one product, a product that admittedly will compete with NewLeaf's product. However, the Court sees no reason why, if NewLeaf ultimately prevails, an award of money damages, which includes an amount for lost profits would not adequately compensate NewLeaf. In a case factually similar to this one, another court in this district reached the same conclusion. In *Varsity Spirit Fashions and Supply v. Alexander*, Civ. No. 4-85-380, 1985 WL 404, at *2, (D. Minn. Mar. 22, 1985), the Court was faced with a scenario in which plaintiff alleged that

former employees had pirated its designs, patterns, specifications, manuals, and customer lists and used them to form a competing company. *Id.* at *1. Plaintiff moved to enjoin defendant from publishing a sales catalog containing alleged misappropriated designs and from contacting customers or potential customers of plaintiff. *Id.* Defendants argued that none of plaintiff's materials met the requirements of trade secrets under Minnesota law. *Id.* In that case, the court denied plaintiff's motion for a preliminary injunction concluding that plaintiff "has not demonstrated that money damages would fail to compensate it for any wrongful use of its . . . designs or other materials." *Id.* The same is true in this case. The absence of irreparable harm weighs against ordering a preliminary injunction.

### C. Harm to Other Litigants

NewLeaf argues that a preliminary injunction would not harm third parties and that it simply seeks to preserve the status quo. *Dataphase*, however, does not direct courts to analyze the harm to third parties. Instead, it requires that courts balance the potential harm to the NewLeaf with the harm that would result to other litigants in the event an injunction is issued. *Dataphase*, 640 F.2d at 114. BestBins argues that if an injunction is ordered, it would likely be forced out of business. As a start-up company, BestBins contends that it is entirely dependent on investor capital and bank loans. Without the opportunity to market and sell its new (and only) product BestBins will be unable to produce revenue necessary to make loan payments and other necessary business expenditures. The harm to BestBins is therefore potentially quite severe in the event that an injunction is ordered. NewLeaf has not made a similarly convincing argument. As a

result, the Court finds that on balance, this factor too weighs against ordering a preliminary injunction.

### D. Public Interest

Neither party has articulated compelling public interest factors that weigh strongly in their favor. This factor, therefore favors neither party.

## III. Conclusion

Having evaluated all of the *Dataphase* factors, the Court finds that NewLeaf has failed to sustain its burden of demonstrating the need for a preliminary injunction. NewLeaf has not been able to make a showing that it is likely to succeed on the merits of its MUSTA claim, primarily because it has not been able to articulate with specificity those trade secrets that BestBins has allegedly misappropriated. In addition, NewLeaf has not proffered sufficient evidence to show that there has been misappropriation or a threat of misappropriation of trade secrets at this time. Further, the Court is unconvinced that NewLeaf will suffer irreparable harm absent an injunction. An ultimate award of monetary damages, if BestBins was found to have improperly used NewLeaf's trade secrets, would be sufficient to compensate NewLeaf in this case. The third factor also cuts against ordering an injunction as the balance of harms appears to favor BestBins at this time. Accordingly, NewLeaf's motion for a preliminary injunction is denied.[11]

[11] The Court nonetheless reiterates that its ruling on this motion in no way reflects an opinion on the ultimate merit or viability of NewLeaf's claims.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. NewLeaf's motion for a preliminary injunction is **DENIED.**

2. The Court's Temporary Restraining Order [Docket No.10] is **VACATED.**

DATED: April 10, 2001
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge